IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DMITRY FASOLYAK | ) | |
| | ) | |
| 11711 Lake Potomac Drive | ) | |
| Potomac, Maryland 20854, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. _____ |
| | ) | |
| THE CRADLE SOCIETY, INC. | ) | |
| | ) | |
| Serve: | ) | |
| F&L Corp. | ) | |
| 321 North Clark Street | ) | |
| Suite 2800 | ) | |
| Chicago, Illinois 60610, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Now comes plaintiff, Dmitry Fasolyak, by and through the undersigned counsel, and for his complaint against defendant The Cradle Society, Inc., states and alleges as follows:

PARTIES

1. Plaintiff Dmitry Fasolyak (hereinafter referred to as "Plaintiff") is an adult individual, whose address is 11711 Lake Potomac Drive, Potomac, Maryland 20854.

2. Defendant The Cradle Society, Inc. (hereinafter referred to as "Defendant) is a not for profit corporation organized under the laws of the State of Illinois. On information and belief, Defendant's principal office is located at 2049 Ridge Avenue, Evanston, Illinois 60201.

<u>JURISDICTION AND VENUE</u>

3.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 and D.C. Code §§ 13-422 and 13-423.

4.  Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (2).

BACKGROUND

5.  Plaintiff is engaged in the business of facilitating lawful adoptions of infants and children from the Russian Federation and is an expert in the field of such adoptions.

6.  Plaintiff provides advisory, consulting, management, and administrative services to organizations that arrange and facilitate lawful adoptions of infants and children from the Russian Federation by families residing in the United States of America.

7.  Defendant is an adoption agency that arranges and facilitates lawful adoptions of infants and children by families residing in the United States of America.

8.  In 2003, Defendant requested that Plaintiff establish for Defendant an adoption program in the Russian Federation, through which Defendant would arrange and facilitate adoptions of infants and children from the Russian Federation by families residing in the United States of America (hereinafter referred to as "the Russian Program").

9.  Defendant asked Plaintiff to set up the Russian Program and to provide to it consulting, advisory, management, and administrative services in connection with the Russian Program.

10. Plaintiff agreed and promptly began setting up the Russian Program and providing to Defendant services related to that program.

11. In early 2004, Plaintiff and Defendant entered into a formal written agreement regarding Plaintiff's services to Defendant, dated and effective as of January 1, 2004 (hereinafter referred to as "the Agreement").

12. The Agreement was drafted and prepared by Defendant.

13. A true copy of the Agreement is attached hereto as Exhibit 1 and incorporated herein by reference.

14. The parties anticipated that the Agreement would, to a substantial degree, be performed by Plaintiff from his offices in Montgomery County, Maryland, and in the District of Columbia. The Agreement was, in fact, to a substantial degree, performed by Plaintiff and Defendant in Washington, D.C.

15. One of Plaintiff's responsibilities under his contract with Defendant was to perform work at the Embassy of the Russian Federation in Washington, D.C. and to make arrangements for others to perform services on his behalf for Defendant at that Embassy.

16. Plaintiff did, both directly and through his agents, regularly and repeatedly perform services for Defendant under the contract at issue in this case at the Embassy of the Russian Federation in Washington, D.C.

17. Plaintiff did, in performance of his obligations under the contract at issue in this case, hold meetings on behalf of Defendant with officials of the Russian Federation in Washington, D.C. Specifically, Plaintiff held several meetings with officials of the Russian Federation to assist Defendant in obtaining official accreditation to engage in adoptions in Russia. An adoption agency that is not properly accredited is not permitted to do adoption work in the Russian Federation.

18. Plaintiff held meetings with Russian officials at the Embassy of the Russian Federation in Washington, D.C. to assist Defendant in obtaining official accreditation.

19. Plaintiff hosted visiting government officials from the Russian Federation in Washington, D.C. to assist Defendant in obtaining official accreditation.

20. Defendant sent information and materials to Plaintiff and requested that Plaintiff travel to Washington, D.C. to deliver those materials to the Embassy of the Russian Federation in Washington, D.C.

21. Plaintiff did, both directly and through his agents, travel repeatedly to Washington, D.C. to deliver and receive official documents at and to the Embassy of the Russian Federation in Washington, D.C.

22. Plaintiff utilized the materials he delivered to and received from the Russian Embassy in Washington in connection with the performance of the Agreement.

23. Plaintiff had multiple meetings in Washington, D.C. with employees of Defendant concerning performance of the Agreement at issue in this case.

24. Employees of Defendant traveled to Washington, D.C. to meet with Plaintiff in the course of performance of the Agreement.

25. Defendant's counsel traveled to Washington, D.C. and performed legal services related to the Agreement at issue in this case on behalf of Defendant in the District of Columbia.

26. On information and belief, Defendant's counsel has an office sharing arrangement whereby offices of a Washington, D.C. law firm have been and are utilized by Defendant's counsel for performed legal services related to the Agreement at issue in this case and the Russian Program on behalf of Defendant.

27. The Agreement anticipates that Defendant would have an office in Moscow, Russia.

28. The Agreement provides that Plaintiff would supervise, manage, and administer the Russian Program and would have broad powers and responsibilities with regard to the management and administration of Defendant's Moscow office.

29. The Agreement provides that Plaintiff would pay the expenses necessary to operate Defendant's Moscow office.

30. The Agreement further provides that the expenses necessary to operate the Moscow office should be determined through a budget submitted by Plaintiff to Defendant each month.

31. At great personal expense, Plaintiff established and organized Defendant's Moscow office, leased real estate for that office, purchased office equipment for that office, and found personnel for that office.

32. At great personal expense, Plaintiff established and organized for Defendant a network of experienced adoption coordinators in the Russian Federation.

33. Coordinators employed by Defendant in Russia traveled to Washington, D.C. to meet with, and did meet with Plaintiff concerning the performance of their job responsibilities as coordinators under the Russian Program.

34. Plaintiff helped Defendant obtain all the accreditations and registrations necessary for Defendant to operate in the Russian Federation in general and in specific regions of the Russian Federation.

35. Plaintiff performed services on behalf of Defendant in Washington, D.C. to assist Defendant to obtain accreditation in the Russian Federation.

36. Plaintiff's efforts, particularly those services rendered by Plaintiff in Washington, D.C., were instrumental to the success of Defendant's efforts to obtain and maintain such accreditations and registrations.

37. Plaintiff was instrumental and played the key role in promoting Defendant's Russian Program in the Russian Federation and in the United States of America.

38. The Agreement provides that Defendant would cause each prospective adoptive family working with Defendant to adopt one or more children from the Russian Federation to pay Plaintiff a specified fee (hereinafter referred to as the "Russian Fee").

39. The Russian Fee was initially set at US$16,500.00 per adoption and could only be changed by mutual agreement of the parties to the Agreement.

40. By mutual agreement of Plaintiff and Defendant, the Russian Fee was increased to US$18,500.00 starting July 2005.

41. The Russian Fee was payable by check or money order in Rockville, Maryland and/or to such persons and at such addresses as Plaintiff would reasonably direct.

42. In consideration of the payments of the Russian Fees, Plaintiff agreed to manage and coordinate the Russian Program, supervise and coordinate activities related to specific adoptions in the Russian Federation, manage Defendant's Moscow office, and pay the reasonable expenses of the Russian Program, and particularly the rent for Defendant's Moscow office, the salaries of the staff of Defendant's Moscow office, and the relevant banking and communications expenses.

43. Plaintiff could only fully perform the Agreement and manage the Moscow office if Defendant provided Plaintiff access to the books and records of the Moscow office.

44. The Russian Program began functioning and was touted as a significant success in Defendant's annual reports.

45. According to Defendant's 2004 annual report, in 2003, the Russian Program resulted in 15 (fifteen) successful adoptions, whereas in 2004 it resulted in 46 (forty-six) successful adoptions.

46. According to Defendant's 2004 annual report, The Russian Program adoptions represented a significant percentage of the total adoptions arranged by Defendant in that year and, indeed, over 40 (forty) percent of the international adoptions arranged by Defendant in that year.

47. In most or all of the successful adoptions under the Russian Program, Plaintiff, either directly or through his agents, traveled to the Embassy of the Russian Federation in Washington, D.C.  on behalf of Defendant to complete the paperwork for the adoption.

48. In the second half of 2004 and in early 2005, the accreditation of U.S. adoption agencies working in the Russian Federation, Defendant among them, were suspended by Russian government authorities, and no adoptions could be completed by these agencies.

49. Throughout the time that Defendant's accreditation was suspended, Defendant represented to Plaintiff and assured Plaintiff that it would continue to use the services of Plaintiff if it were re-accredited by the appropriate Russian authorities.

50. In reliance on such representations, Plaintiff met with officials of the Russian Federation in Washington, D.C. to promote and support the Russian Program.

51. Plaintiff undertook these efforts in Washington, D.C. on behalf of Defendant based on assurances that Plaintiff would continue to work with Defendant once Defendant was re-accredited.

52. On or around February 23, 2005, Defendant agreed to pay 50 (fifty) percent of the salaries of the key Moscow office employees and 50 (fifty) percent of the Moscow office rent beginning April 1, 2005, and continuing until re-accreditation. By Defendant's own admission, that 50 (fifty) percent amount (salaries and rent) equaled approximately US$1,400 per month.

53. The remaining 50 (fifty) percent of said Moscow office salaries and Moscow office rent and most or all of the other expenses of the Russian Program continued to be paid by Plaintiff.

54. By mid-2005, several of the U.S. adoption agencies working in the Russian Federation were re-accredited by the Russian authorities and were permitted to resume fully adoption work in the Russian Federation.

55. Defendant was one of those few U.S. adoption agencies that was re-accredited and could resume adoption work in the Russian Federation.

56. Defendant was re-accredited by the Russian authorities in September 2005.

57. Defendant's successful re-accreditation was, to a large extent, a result of Plaintiff's diligence and efforts, and specifically based on Plaintiff's efforts on behalf of Defendant in Washington, D.C.

58. While Defendant's re-accreditation was pending, Plaintiff continued coordinating work on Defendant's adoptions to the extent that it was possible to do so legally in the absence of an official Russian government accreditation.

59. In or around September 2005, Plaintiff requested that Defendant replace the head of Defendant's Moscow office due to serious concerns about competence and integrity.

60. Pursuant to the Agreement, Plaintiff was responsible for supervising, managing and coordinating the entire Russian Program and Defendant's Moscow office.

61. The Agreement gives Plaintiff authority to hire and fire employees of Defendant's Moscow office.

62. Plaintiff was paying the expenses of the Russian Program and the salaries of the staff of Defendant's Moscow office, including the salary of the head of the Moscow office.

63. Defendant refused to allow Plaintiff to replace the head of the Moscow office.

64. In July 2005, Defendant ceased giving to Plaintiff or referring to Plaintiff new adoption cases. This continued after Defendant was re-accredited in September 2005.

65. In July 2005, Defendant ceased making payments of the Russian Fees for new cases to Plaintiff. This continued after Defendant was re-accredited in September 2005.

66. Instead of giving new cases to Plaintiff, Defendant, on information and belief, either withheld them or forwarded them directly to Defendant's Moscow office, the head of Defendant's Moscow office, and Defendant's Moscow and regional staff, bypassing Plaintiff entirely.

67. Since July 2005, only one new case was given to Plaintiff by Defendant, and that was only after Plaintiff discovered, in late 2005, that the case had been sent by Defendant to Defendant's Moscow office and to one of Defendant's regional coordinators in Russia, without notice to Plaintiff and without Plaintiff's knowledge or consent.

68. Beginning in July 2005 and continuing thereafter, Defendant withheld information about new cases from Plaintiff, including the names of the new adopting families.

69. Beginning in July 2005 and continuing thereafter, with the one exception referenced in paragraph 54 above, Defendant would not allow Plaintiff to coordinate work on new adoption cases.

70. On information and belief, the Russian Fees being collected from adopting families were withheld from Plaintiff and forwarded directly to the staff of Defendant's Moscow office and/or retained by Defendant.

71. Plaintiff has not received a single new adoption case, file or dossier from Defendant since July 2005, other than the one case referred to in paragraph 54 hereof, and, notwithstanding the terms of the Agreement, has not received a single payment of any portion of the Russian Fees for any adoption cases begun after July 2005, except for the initial payment of US$5,000.00 in connection with the single case referred to in paragraph 54 hereof.

72. Since July 2005, Defendant has been preventing Plaintiff from exercising any effective control and supervision over Defendant's Moscow office and Moscow and Russian staff.

73. With the consent, support, acquiescence, and encouragement of Defendant, Defendant's Moscow staff began incurring and did incur significant and unjustified costs and expenses and caused the costs of the Moscow office to increase significantly. This was done without the consent of Plaintiff, contrary to Plaintiff's express instructions, and over Plaintiff's objections and protests.

74. With the consent, support, acquiescence, and encouragement of Defendant, Defendant's Moscow staff took funds and assets that belonged to Plaintiff and/or to which Plaintiff was entitled to keep or receive, and kept and used those funds and

assets for the benefit of Defendant and for their personal use, benefit, and enjoyment. This was done without the consent of Plaintiff, and oftentimes contrary to Plaintiff's express instructions and over Plaintiff's objections and protests.

75. With the consent, support, acquiescence, and encouragement of Defendant, the head of Defendant's Moscow office unilaterally increased her own salary and the salary of Defendant's Moscow and Russian staff. Plaintiff's consent to any such increase was neither requested nor given.

76. Even though Defendant was preventing Plaintiff from exercising effective control and supervision over Defendant's Moscow office and Moscow staff, and ceased making payments of the Russian Fees as provided for in the Agreement, Defendant kept insisting – and continues to insist – that Plaintiff pay in their entirety the increased costs and expenses of the Moscow office and the salaries of the Moscow and Russian staff.

77. Defendant denied Plaintiff access to and control over the costs and expenses of the Russian Program and of Defendant's Moscow office, denied Plaintiff access to information about the costs and expenses of the Russian Program and of Defendant's Moscow office, and denied Plaintiff access to the books and records of the Moscow office.

78. Defendant did not issue a formal invoice, statement, or description of the costs and expenses of the Moscow office for the months of October, November and December 2005 or for the month of January 2006 until February 2006, but nevertheless insisted that Plaintiff pay those costs and expenses, and wrongfully claimed that Plaintiff was in default because he was not paying those costs and expenses.

79. On or around February 9, 2006, Defendant issued an invoice to Plaintiff for Moscow office expenses for the months of October, November and December 2005 and January and February 2006. The invoice was for US$51,811.00.

80. During the time that Plaintiff was managing and supervising Defendant's Moscow office, the expenses of the Moscow office would ordinarily not exceed US$4,000 in any given month.

81. Plaintiff repeatedly demanded that he be shown all of the bills, invoices and other supporting documents on which the invoice for US$51,811.00 was based, but as of the date hereof, those bills, invoices and other supporting documents have not been shown to Plaintiff.

82. Defendant effectively prevented Plaintiff from preparing and submitting budgets for the operation of the Moscow office.

83. With regard to the cases that were received by Plaintiff from Defendant before Defendant ceased giving Plaintiff new cases in July 2005, Defendant tried to coordinate those cases directly without using the services of Plaintiff.

84. When several of those cases nearly resulted in failure due to incompetent actions of Defendant and Defendant's staff, whom Plaintiff was no longer allowed to supervise and control, Defendant implored Plaintiff to manage and coordinate work on those several cases and to bring those several cases to completion.

85. Defendant represented that Plaintiff would be compensated in full for the completed cases and would receive the full Russian Fee for each completed case.

86. In order to prevent undue hardship to the adopting families and significant embarrassment to Defendant, Plaintiff did help complete those several cases, and the cases all resulted in successful adoptions.

87. Plaintiff completed those several cases at great personal expense but, as of the date hereof, still has not been paid the full amounts of the Russian Fees for several of those completed cases.

88. With regard to the remaining cases received by Plaintiff before Defendant ceased giving Plaintiff new cases in July 2005 and the single case received after July 2005, Plaintiff has repeatedly indicated that he is ready, able, and willing to coordinate work on those cases.

89. However, Defendant has interfered with Plaintiff's efforts to coordinate work on those cases, and has refused to allow Plaintiff to coordinate work on most of those cases, while at the same time making conflicting demands and requests for full cooperation and assistance.

90. Plaintiff has incurred substantial expenses in connection with the pending cases received before July 2005 and the single case received after July 2005 but, as of the date hereof, has not received the full Russian Fee for any of those cases.

91. Section 4(a) of the Agreement provides that the Agreement shall remain in effect for a term of five (5) years.

92. In 2005 and 2006, Defendant's senior and supervisory personnel began making defamatory statements concerning Plaintiff.

93. Plaintiff told Defendant's executive director about this during a meeting in Washington, D.C., in December 2005 and received assurances that the defamatory statements would stop.

94. Defendant's senior staff in Moscow, however, continued to make defamatory statements regarding Plaintiff.

95. Specifically, the head of Defendant's Moscow office told one of Defendant's regional coordinators in Russia that Plaintiff is a dishonest man, that Plaintiff cheats and deceives everyone, that Plaintiff cheats people out of moneys earned, and that Plaintiff has deceived her personally.

96. The head of Defendant's Moscow office made similar representations to at least three more of Defendant's regional coordinators.

97. The head of Defendant's Moscow office made similar representations to third parties, including other adoption specialists and professionals and adopting families.

98. On information and belief, in 2005 and 2006, Defendant's Moscow office represented to third parties that arrangements have been made to do adoption work without using the services of Plaintiff.

99. Furthermore, in or around early March 2006, Defendant made representations to clients of Plaintiff involved in international adoptions that it had terminated its relationship with Plaintiff and that it had terminated the Agreement.

100.    Defendant has not given notice of termination of the Agreement, and Plaintiff is ready, willing and able to perform work under the Agreement.

## CLAIMS

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

101.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 100 of this Complaint with the same effect as if herein fully set forth.

102.    The Agreement between Plaintiff and Defendant constitutes a valid and binding contract.

103.    Defendant received good and valuable consideration under the Agreement in the form of services provided and obligations to provide valuable services, funds, and assets.

104.    Plaintiff faithfully and diligently performed all of his obligations under the contract.

105.    Defendant breached its contract with Plaintiff by, *inter alia*:

(a) not paying the agreed-upon fees on time and in full;

(b) misrepresenting and understating the amounts owed to Plaintiff for adoptions completed;

(c) withholding and concealing adoption cases, files, dossiers, documents, records, and papers from Plaintiff;

(d) failing to refer all of Defendant's Russian adoption cases to Plaintiff;

(e) failing to accurately and truthfully account to Plaintiff for adoption cases and revenues generated therefrom;

(f) interfering with Plaintiff's performance of his duties under the Agreement;

(g) refusing to allow Plaintiff to complete adoptions as agreed;

(h) preventing and interfering with Plaintiff's efforts to coordinate adoption work and activities;

(i) failing to pay Plaintiff the Russian Fees on all Russian adoptions completed or in process;

(j) failing to pay Plaintiff the Russian Fees on all Russian adoptions available to Defendant;

(k) frustrating Plaintiff from preparing budgets for Moscow office operations;

(l) incurring expenses for operation of the Moscow office not approved in a budget prepared by Plaintiff;

(m) preventing Plaintiff from exercising the agreed-upon control over the Moscow office and the Russian Program, its budget and its operations;

(n) participating in adoptions in Russia without Plaintiff's involvement;

(o) over billing Plaintiff for costs and expenses;

(p) appropriating and misappropriating funds and assets that belong to Plaintiff or to which Plaintiff is entitled, or which Plaintiff is entitled to receive pursuant to the Agreement;

(q) supporting and encouraging Defendant's staff to misappropriate funds and assets that belong to Plaintiff or to which Plaintiff is entitled, or which Plaintiff is entitled to receive pursuant to the Agreement.

(r) supporting and encouraging Defendant's staff to disobey Plaintiff and to interfere with the performance of the Agreement;

(s) improperly and wrongfully claiming to have terminated the Agreement and the business relationship with Plaintiff;

(t) planning to intentionally violate the terms of the Agreement;

(u) publishing defamatory statements about Plaintiff and placing Plaintiff in false light; and

(v) failing to act fairly and in good faith.

106.    As a direct and proximate result of Defendant's breach of contract, Plaintiff suffered damages and sustained losses in the amount of at least US$2,500,000.00 (Two Million Five Hundred Thousand Dollars).

SECOND CAUSE OF ACTION
INTENTIONAL MISREPRESENTATION
(FRAUD AND DECEIT)

107.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 106 of this Complaint with the same effect as if herein fully set forth.

108.    Beginning in 2003 and continuously until at least November 2005, Defendant represented to Plaintiff that Plaintiff would coordinate, manage, and supervise the Russian Program and Defendant's Moscow office and Moscow office staff.

109.    Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that Plaintiff would coordinate work on all of Defendant's adoption cases in Russia.

110.    Beginning in 2003 and continuously until at least November 2005, Defendant represented to Plaintiff that it would refer all of Defendant's adoption business in Russia to Plaintiff and would cause Plaintiff to be paid the Russian Fees for each and all of Defendant's Russian adoptions.

111.    In early 2004, Defendant represented to Plaintiff that it would refer all of Defendant's adoption business in Russia to Plaintiff and cause Plaintiff to be paid the

Russian Fee for each of Defendant's Russian adoptions for a period of not less than five (5) years.

112.   Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would cause Plaintiff to be paid all of the Russian Fees.

113.   Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would cause Plaintiff to be paid all of the Russian Fees timely and in full.

114.   Beginning in 2003 and continuously until November 2005, Defendant represented to Plaintiff that Plaintiff would have control over the costs and expenses of the Russian Program and the Moscow office.

115.   Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would act fairly and in good faith in all its dealings with Plaintiff.

116.   Beginning February 2005 and continuously until Defendant's re-accreditation in September 2005, Defendant represented to Plaintiff that it would continue to work with Plaintiff after re-accreditation.

117.   The foregoing representations were false when made and were known by Defendant to be false.

118.   Defendant made these representations intentionally and with knowledge of their falsehood in order to induce Plaintiff to expend substantial assets and/or efforts to set up the Russian Program for Defendant; to diligently support, fund, maintain, and pay the expenses of Defendant's Moscow office and Defendant's Russian Program; to

promote and expand the Russian Program; to expand the network of regional coordinators for Defendant's Russian Program; to provide valuable services to Defendant and its clients; to help Defendant obtain accreditation and re-accreditation; and to help Defendant complete certain adoption cases that had been mismanaged by Defendant's staff.

119.    Plaintiff did, in fact, expend substantial assets and/or efforts to set up the Russian Program for Defendant; to diligently support, fund, maintain, and pay the expenses of Defendant's Moscow office and Defendant's Russian Program; to promote and expand the Russian Program; to expand the network of regional coordinators for Defendant's Russian Program; to provide valuable services to Defendant and its clients; to help Defendant obtain accreditation and re-accreditation; and to help Defendant complete certain adoption cases.

120.    In so expending assets and/or efforts, Plaintiff reasonably and with right relied on Defendant's false representations.

121.    These representations were highly material to Plaintiff's decision to expend assets and/or efforts as described herein.

122.    As a result of Defendant's intentional misrepresentation, Plaintiff suffered damages and sustained losses in the amount of US$2,500,000.00 (Two Million Five Hundred Thousand Dollars).

THIRD CAUSE OF ACTION
NEGLIGENT MISREPRESENTATION

123.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 122 of this Complaint with the same effect as if herein fully set forth.

124.    Beginning in 2003 and continuously until at least November 2005, Defendant represented to Plaintiff that Plaintiff would coordinate, manage, and supervise the Russian Program and Defendant's Moscow office and Moscow office staff.

125.    Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that Plaintiff would coordinate work on all of Defendant's adoption cases in Russia.

126.    Beginning in 2003 and continuously until November 2005, Defendant represented to Plaintiff that it would refer all of Defendant's adoption business in Russia to Plaintiff and cause Plaintiff to be paid the Russian Fees for each and all of defendant's Russian adoptions.

127.    In early 2004, Defendant represented to Plaintiff that it would refer all of defendant's adoption business in Russia to Plaintiff and would cause Plaintiff to be paid the Russian Fees for each and all of defendant's Russian adoptions for a period of not less than five (5) years.

128.    Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would cause Plaintiff to be paid all of the Russian Fees.

129.    Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would cause Plaintiff to be paid all of the Russian Fees timely and in full.

130.    Beginning in 2003 and continuously until November 2005, Defendant represented to Plaintiff that Plaintiff would have control over the costs and expenses of the Russian Program and the Moscow office.

131.    Beginning in 2003 and continuously until the date hereof, Defendant has been representing to Plaintiff that it would act fairly and in good faith in all its dealings with Plaintiff.

132.    Beginning February 2005 and continuously until Defendant's re-accreditation in September 2005, Defendant represented to Plaintiff that it would continue to work with Plaintiff after re-accreditation.

133.    The foregoing representations were false when made.

134.    Defendant owed Plaintiff a duty to exercise due care in making statements upon which Defendant knew Plaintiff would rely in performing services and expending money.

135.    Defendant negligently made the foregoing false statements.

136.    It was foreseeable that Plaintiff would rely on Defendant's false statements.

137.    Plaintiff did rely on Defendant's false and negligent statements.  Defendant's negligent statements induced Plaintiff to expend substantial assets and/or efforts to set up the Russian Program for Defendant; to diligently support, fund, maintain and pay the expenses of Defendant's Moscow office and Defendant's Russian Program; to promote and expand the Russian Program; to expand the network of regional coordinators for Defendant's Russian Program; to provide valuable services to Defendant and its clients; to help Defendant obtain accreditation and re-accreditation; and to help Defendant complete certain adoption cases that had been mismanaged by Defendant's staff.

138.    Plaintiff did, in fact, expend substantial assets and/or efforts to set up the Russian Program for Defendant; to diligently support, fund, maintain and pay the expenses of

Defendant's Moscow office and Defendant's Russian Program; to promote and expand the Russian Program; to expand the network of regional coordinators for Defendant's Russian Program; to provide valuable services to Defendant and its clients; to help Defendant obtain re-accreditation; and to help Defendant complete certain adoption cases.

139.    In so expending assets and/or efforts, Plaintiff reasonably and with right relied on Defendant's false and negligent representations.

140.    These representations were highly material to Plaintiff's decision to expend assets and/or efforts as described herein.

141.    As a result of Defendant's negligent misrepresentations, Plaintiff suffered damages and sustained losses in the amount of US$2,500,000.00 (Two Million Five Hundred Thousand Dollars).

FOURTH CAUSE OF ACTION
UNJUST ENRICHMENT

142.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 141 of this Complaint with the same effect as if herein fully set forth.

143.    Plaintiff provided valuable services to Defendant, at great expense, and expended and contributed significant funds and other assets to, for, and for the benefit of Defendant.

144.    Those services, funds and assets conferred an appreciable benefit on Defendant in an amount not less than US$2,500,000.00 (Two Million Five Hundred Thousand Dollars).

145.    Defendant knowingly accepted the benefit of those services, funds and other assets.

146.    In light of the circumstances described herein, it would be unjust and inequitable to allow Defendant to retain the benefit of those services, funds and other assets without payment of their value to Plaintiff.

## FIFTH CAUSE OF ACTION
## QUANTUM MERUIT

147.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 146 of this Complaint with the same effect as if herein fully set forth.

148.    Plaintiff rendered valuable services to Defendant at great personal expense, expecting to be fully, timely, and properly compensated therefor by Defendant.

149.    Defendant received those valuable services, benefited from those valuable services, and enjoyed those valuable services, with the knowledge that Plaintiff rightfully expected to be compensated therefor.

150.    The services were rendered under such circumstances that Defendant had reasonable notice that Plaintiff expected to be compensated for the services rendered.

151.    Plaintiff is, therefore, entitled to judgment for the value, *quantum meruit*, of the services rendered.

## SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

152.    Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 151of this Complaint with the same effect as if herein fully set forth.

153.   Plaintiff provides services to adoption agencies and has a clear interest and a reasonable expectancy of continuing to provide such services and of expanding his services and his clientele.

154.   Defendant knew of that clear interest and reasonable expectancy.

155.   Defendant intentionally and without justification interfered with that clear interest and reasonable expectancy, *inter alia,* by:

   (a) making and publishing defamatory statements and representations about Plaintiff and statements and representation that placed Plaintiff in a false light to members of the adoption community, third parties, and specific adoption agencies, which impugned Plaintiff's personal and professional integrity, honesty, and competence, and Plaintiff's ability to perform his work and work duties; and

   (b) specifically inviting and encouraging adoption agencies and professionals to work with Defendant without using the services of Plaintiff and not to rely on the services of Plaintiff.

156.   As a result of such tortuous interference with Plaintiff's prospective economic advantage and relations, Plaintiff suffered damages and sustained losses in the amount of US$2,500,000.00 (Two Million Five Hundred Thousand Dollars)..

SEVENTH CAUSE OF ACTION<br>ACCOUNTING

157.   Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 1 through 156 of this Complaint with the same effect as if herein fully set forth.

158.    Plaintiffs are entitled pursuant to the Agreement to documents showing the affairs, records and accounts of Defendant with respect to Russian adoptions, the Russian Program and the Moscow office.

159.    Defendant has exclusive control and possession of most or all of the books, records, documents and accounts related to the Russian Program and the Moscow office.

160.    Defendant has failed to accurately state the expenses of the Moscow office.

161.    Defendant has failed to accurately account to Plaintiff for all adoption cases handled by Defendant in Russia.

162.    Plaintiff has made several attempts to ascertain the actual expenditures of the Moscow office and has attempted to obtain information regarding the status of ongoing and prospective adoption cases of Defendant in Russia.

163.    Defendant has failed to cooperate with Plaintiff in providing the requested information.

164.    On information and belief, defendant is misstating the actual expenses of the Moscow office.

165.    On information and belief, defendant is misstating the actual ongoing and actual number of adoption cases being processed by and/or available to the Moscow office.

166.    Plaintiff requires a full accounting of the operations of the Moscow office and of defendant related to Russian adoptions.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendant:

(1) declaring that Defendant has committed the breaches and offenses complained of herein;

(2) ordering Defendant to pay Plaintiff damages in the amount of not less than US$2,500,000.00 (Two Million Five Hundred Thousand Dollars).

(3) awarding Plaintiff the costs and disbursements of this action, interest and reasonable attorneys' fees;

(4) enjoining Plaintiff from making any further defamatory, derogatory, pejorative or disparaging statements, representations and remarks concerning Plaintiff and Plaintiff's business; and

(5) awarding Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

John D. Quinn, Esq.
SALE & QUINN, P.C.
910 16th Street, N.W.
Suite 500
Washington, D.C. 20006
Telephone:    (202) 833-4170
Fax:          (202) 887-5137
E-mail:       JDQCSQ@aol.com

Dmitri A. Chernov, Esq.
Three Bethesda Metro Center
Suite 910
Bethesda, MD 20814
Telephone:    (240) 447-8625
Fax:          (301) 907-7790
E-mail:       Dchernov@aol.com

*Counsel for Plaintiff*

26

Dated:  June 20, 2006

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues herein.

_____
John D. Quinn

EXHIBIT 1

<u>AGREEMENT</u>

THIS AGREEMENT, dated as of January 1, 2004, is between The Cradle Society, a not for profit corporation organized under the laws of Illinois ("The Cradle") and Dmitry Fasolyak, (the "Consultant").

WHEREAS, The Cradle is accredited by the Russian Federation as an adoption agency and is therefore authorized to arrange for the placement of children born in the Russian Federation with adoptive parents residing in the United States (the "Russian Program"); and

WHEREAS, the Consultant has been assisting The Cradle with its Russian Program, is an expert in the practices and procedures in the Russian Federation which are necessary and required by Russian law to achieve the placement of Russian children eligible for adoption, and is willing to continue to assist The Cradle in the operation and development of its Russian Program;

## NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. <u>Duties of Consultant</u>. Consultant shall provide advice and coordination to The Cradle with respect to all activities in the Russian Federation which are necessary to achieve the placement of children from the Russian Federation with adoptive parents residing in the United States. Such coordinating activities shall include (without limitation):

    (a) Faithfully supporting, building and promoting The Cradle's Russian Program within the Russian Federation, including the Ministry of Education;

    (b) Assisting The Cradle in identifying and establishing appropriate working relationships with those persons in the Russian Federation who are qualified and appropriate to perform the various functions which are necessary to operate the Russian Program and assisting The Cradle in the supervision of such persons;

    (c) Advising The Cradle with respect to the practices and procedures required by the Government of the Russian Federation to operate the Russian Program in accordance with Russian law and regulations, and with respect to all actions necessary to maintain the accreditation of The Cradle by the Russian Federation; and

1

(d) Assisting The Cradle with all actions necessary to obtain referrals of children eligible for adoption within four months, on average, of the times completed documentation is provided by The Cradle to the Moscow office, and ensuring that all actions are taken in Russia which are necessary to complete adoptions under Russian law and regulations.

(e) Ensuring that the Russian Program operates in compliance with all applicable Russian laws and regulations and, when applicable, the Hague Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption and the Regulations issued by the United States Department of State (as such Convention and Regulations affect activities in Russia).

2.  **Fees and Expenses**.

(a) The Cradle will cause adoptive families working with The Cradle to pay the fee necessary to complete an adoption in Russia (the "Russian Fee") by money order or cashier's check payable to Alexander Sukharev, at the following address in the United States, 5541 Nicholson Lane, Suite 304, Rockville, Maryland 20852, or to such other person at such other address in the United States as Consultant may direct. The Russian Fee is a maximum of $16,500, and will be reviewed annually by The Cradle and the Consultant to determine whether or not an adjustment should be made by reason of inflation or other economic conditions. The Russian Fee may not be changed without the mutual consent of the parties evidenced by an amendment to this Agreement.

(b) Consultant agrees to assume responsibility for and to pay all of the expenses necessary to operate the Russian Program in Russia, including (without limitation) rent, salaries of all persons employed by The Cradle in Russia, and expenses for banking and communications. Consultant will, not later than the 20th day of each month, provide to The Cradle a detailed accounting of the expenses to be paid for such month, and remit to The Cradle the amount necessary to pay all such expenses. The Cradle will transmit those funds to the account of its office in Moscow.

3.  **Relationship of Parties**. Consultant shall act hereunder as an Independent Contractor, and shall not for any purposes under any applicable law be deemed to be an employee of The Cradle.

2

4. Term of Agreement.

    (a) The term of this Agreement shall be five years from the date hereof (the "Anniversary Date"), provided however, that the Agreement shall be automatically extended for another year on each Anniversary Date unless either party shall, by written notice to the other, decline to enter into any such extension, in which case the Agreement shall expire at the end of the then-existing term.

    (b) Notwithstanding the foregoing, (i) each party shall have the right to terminate this Agreement for any reason upon the giving of 120 days written notice to the other party, and (ii) each party shall have the right to terminate this Agreement in the event of a material default by the other party by giving 30 days written notice to such defaulting party.

    (c) In the event of any termination of this Agreement, both parties agree to take all necessary steps to complete adoptions then in process pursuant to this Agreement.

5. Entire Agreement. This Agreement constitutes the entire agreement and understanding of the parties relative to the subject matter hereof, and supersedes all prior agreements, representations and understandings, whether written or oral, between the parties. This Agreement may be amended only by a written instrument, duly executed by both parties, which specifically recites that it is intended to so amend this Agreement. There are no representations, promises, or agreements between the parties concerning the subject matter hereof other than as recited herein. The headings used in this Agreement are included solely for the convenience of the parties, and are not intended to modify the meaning of or provide interpretation of any specific provision hereof.

6. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois.

THE CRADLE SOCIETY

By: _____

_____
Dmitry Fasolyak

1.16.04

3